UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
METLIFE, INC., a Delaware Corporation,
METROPOLITAN LIFE INSURANCE
COMPANY, a New York Corporation,

                           Plaintiffs,                        05 Civ. 3960 (PKC)

          -against-
                                                              MEMORANDUM
                                                              AND ORDER

METROPOLITAN NATIONAL BANK, a New
York Corporation,

                           Defendant.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

            Plaintiffs MetLife, Inc. and the Metropolitan Life Insurance Company

("MLI") move for a preliminary injunction to enjoin the defendant Metropolitan National

Bank ("MNB") from utilizing a logo that utilizes the name "MetBank." Since 1968, MLI

has utilized a "MetLife" logo consisting of seven letters with the first and fourth letters

capitalized, in a thick, block, sans-serif font with the individual letters printed in the color

blue.  In 2004, MNB adopted a logo that contains "Met" and "Bank", a total of seven

letters with the first and fourth letters capitalized, in a thick, block, sans-serif font, with

the letters printed in the color blue.  MLI moves to enjoin MNB from using the MetBank

logo at MNB's street-level, retail banking office, which is scheduled to open for business

on July 1, 2005.  (June 13 Tr. at 5-6, 16, 18)  MNB's retail banking site will be located at

99 Park Avenue in midtown Manhattan, in close proximity to the MetLife Building,

which is located at 200 Park Avenue.

On June 13, 2005, I held a hearing on plaintiffs' motion for a preliminary injunction. Testifying at the hearing were Beth Hirschhorn, vice president and chief marketing officer of MLI; Philip Johnson, an expert retained by MLI who conducted a survey on consumer confusion; Mark R. DeFazio, president and chief executive officer of MNB; and George Mantis, an expert retained by MNB who critiqued Johnson's expert report.

Having heard the testimony and reviewed the parties' submissions, I conclude that the plaintiffs have established a probability of success on the merits and irreparable harm. Their motion for a preliminary injunction is granted.

Background

Plaintiffs filed this action on April 20, 2005, alleging trademark infringement and unfair competition pursuant to Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(a) and 1125(a), and trademark dilution under New York General Business Law § 360. MLI alleges that it has broad proprietary rights in a family of "Met" marks, and the Complaint seeks a permanent injunction against the use of the the "Met" prefix by MNB. The motion for a preliminary injunction seeks relief that is considerably narrower in scope: an injunction against the use by MNB of a particular form of the "MetBank" logo at a street-level office located at 99 Park Avenue.

According to DeFazio, MNB commenced operations on June 22, 1999. It was granted a national banking charter under the name Metropolitan National Bank. From inception, MNB used the shortened name "MetBank" with no space between the prefix "Met" and the word "Bank" with a capitalized first letter. Between 1999 and mid-2001, MNB's business focused on commercial real estate loans and middle-market

commercial loans.  (DeFazio Dec. ¶ 7)  MNB also sold certificates of deposit through its office and over an internet web site.  (DeFazio Dec. ¶ 8)  In addition, DeFazio states, MNB offered "more traditional methods of obtaining deposits," including checking accounts and savings accounts.  (DeFazio Dec. ¶ 9)  DeFazio states that by the end of 2004, MNB's website was processing approximately 7,000 transactions per month. (DeFazio Dec. ¶ 9)

MNB also operates a subsidiary, CashZone Check Cashing Corporation ("CashZone").  (DeFazio Dec. ¶ 10)  According to DeFazio, CashZone permits persons without traditional bank relationships to cash checks, wire funds, access ATM machines, and engage in other banking services.  (DeFazio Dec. ¶ 10)  Signs at CashZone locations identify the business as part of MNB by displaying the MetBank logo.  (DeFazio Dec. ¶ 11; Exs. C, D)

MNB's MetBank Marks

A brief history of MNB's use of the MetBank mark is helpful to understanding the plaintiffs' contention that a MNB logo adopted in 2004 infringes plaintiffs' marks.  MNB obtained two service mark registrations with the United States Patent and Trademark Office ("PTO") for use in banking services.  (Werbin Dec. Exs. E, F )  The first of the two applications registered a mark using the MetBank name for use in banking services, and was filed on or about January 25, 2001.  (Werbin Dec. ¶ 4; Ex. A) The design is in black text, with the lettering in a small-caps style, such that the logo reads METBANK.  (Werbin Dec. ¶ 4; Ex. A)  The font includes prominent serifs in the lettering, which give a block-like and angular appearance.  (Werbin Dec. ¶ 4; Ex. A) Perched atop the letters "E" and "T" is a drawing of an eagle, which is heavily textured

and made to appear somewhat three-dimensional.  (Werbin Dec. ¶ 4; Ex. A)  At oral

argument, MNB's counsel characterized the overall appearance of this prior logo as

looking "very official," and the previous eagle image as "the old sort of stodgy eagle

sitting on top of the mark design logo." (Tr. at 14-15)

In response to MNB's application, the PTO sent a non-final Office Action

dated June 5, 2001, stating that the design was "likely to cause confusion" with

registrations owned by the plaintiffs in the marks Met, Met P&C and Met Investment

Services.  (Werbin Dec. ¶ 7; Ex. A)  In October 2001, MNB contacted the plaintiffs to

discuss whether plaintiffs would formally consent to MNB's application to the PTO for

use of the MetBank mark.  (Werbin Dec. ¶¶ 8-11)  According to MNB's general counsel,

MLI's response was "non-committal."  (Werbin Dec. ¶ 12)  Meanwhile, MNB drafted a

response to the PTO's Office Action, which it submitted on December 5, 2001.  (Werbin

Dec. ¶ 14)  The PTO accepted MNB's response, and approved its trademark application

for publication.  (Werbin Dec. ¶ 16)  No opposition was filed, and the PTO granted

MNB's registration on September 10, 2002.  (Werbin Dec. ¶ 16)

On January 9, 2003, MNB filed a second application with the PTO to

register the mark "MetBank," with no design element.  (Werbin Dec. ¶ 17)  MNB

designated the mark for use in connection with "banking services."  (Werbin Dec. ¶ 17)

The PTO did not pursue any Office Action and no opposition was filed when the mark

was published.  (Werbin Dec. ¶ 18)  The PTO granted registration in the mark on October

28, 2003.  (Werbin Dec. ¶ 18)

In 2003 and 2004, MNB decided that its then-existing MetBank logo

should be redesigned.  Stephen McAllister is the creative director and chief executive

officer of Design Matters, Inc! ("DMI"), a graphic design company that assists

enterprises in developing advertising and marketing materials. (McAllister Dec. ¶ 1)

MNB has engaged DMI since 2000. (McAllister Dec. ¶ 3) In 2003, McAllister

approached MNB about launching an overall redesign of MNB's branding. McAllister

describes his goals as follows:

> While working on the [MNB] annual report for 2003, I approached
> [MNB] with a concept for changing the company's identity, developing
> brand architecture and contemporizing the overall look of its
> communications, which at the time were outdated and mismatched. The
> Bank agreed to my proposal, and I proceeded to redesign all of [MNB's]
> then existing corporate communications materials – everything from the
> company's stationary to its logo design to its marketing brochures.

(McAllister Dec. ¶ 4) Ultimately, McAllister proposed a redesigned logo that featured

the word "MetBank." (McAllister Dec. ¶ 5) The text is in blue, utilizing a sans-serif font.

(McAllister Dec. ¶ 5) Instead of the heavily textured eagle image perched atop the letters

"E" and "T," the redesigned logo featured a line drawing of an eagle, placed to the right

of the term "MetBank." (McAllister Dec. ¶ 5) McAllister states:

> I developed this updated identity because I believed it was a cleaner, more
> contemporary design that would be perceived by consumers as being more
> inviting and less institutional than the prior identity, which I had no role in
> creating. At the same time, the new identity preserved the key aspects of
> the company's prior branding, notably the METBANK ® trademark, the
> capitalized and enlarged "M" and "B" and the eagle imagery.

(McAllister Dec. ¶ 5) McAllister declares under penalty of perjury that his design was

not influenced by any of the plaintiffs' designs or logos. (McAllister Dec. ¶ 6) DeFazio

ultimately approved McAllister's design. (June 13 Tr. at 105) MNB has filed an

application to register this logo with the PTO, which MLI is opposing. (June 13 Tr. at

112)

On December 31, 2004, MNB announced that it would open a street-level, retail branch, to be located at 99 Park Avenue. (DeFazio Dec. ¶ 23) MNB had been operating out of the fourth floor of that same building since 2003. (DeFazio Dec. ¶¶ 23-24) DeFazio states that the street-level space will make MNB's services more accessible to its customers. (DeFazio Dec. ¶ 23)

MLI's MetLife and related Marks

MLI was organized in the 19th Century as a life insurance company. In 2004, MLI provided more than $39 billion in financial services. (Hirschhorn Dec. ¶ 6) MLI has registered numerous trademarks with the PTO that utilize "Met" as a prefix. According to the plaintiffs' counsel, MLI first used the "Met Life" mark in 1968 as a single-word abbreviation for "Metropolitan Life." (June 13 Tr. at 7) Sometime in the 1980s, MLI went from using a two-word "Met Life" mark to its current, single-word MetLife mark. (June 13 Tr. at 7) MLI did not register "METLIFE" as a mark until 1989. (Hirschhorn Dec. ¶ 3) In addition to the MetLife name, MLI's registered trademarks, including MetPay, "Get Met. It Pays.", Met-Review, Met-Elect, and numerous other similar terms. (Hirschhorn Dec. ¶ 3) According to Ms. Hirschhorn, MLI's overall branding scheme focuses on widespread consumer recognition of the MetLife mark, as well as the prefix "Met." (Hirschhorn Dec. ¶ 3) MLI expends more than $100 million annually to promote its MetLife brand, which includes advertisements on television, in print, and on aerial blimps that appear at major public events. (June 13 Tr. at 40-41)

Occasionally, as illustrated by an exhibit at the June 13 hearing, MLI varies its use of the mark, as they did in a blimp using the mark "Met life," with the two words separated and "life" written entirely in lowercase. (June 13 Tr. at 7-8) Since

1997, the MetLife logo has often appeared in the font Futura, though it previously appeared in the Helvetica font, and at times still does. (June 13 Tr. at 38-39) Both Helvetica and Futura are sans-serif fonts, although Futura is somewhat bolder in appearance. From 1985 to 2001, MLI marketed itself under the slogan, "Get Met. It Pays." (June 13 Tr. at 40-41) It now uses the slogan, "have you met life today?" (June 13 Tr. at 41) The current MetLife logo often appears in a color called Pantone PMS 285 MetLife blue. (June 13 Tr. at 39) MLI has marketed itself using such a shade of blue since the 1960s. (Hirschhorn Aff. Ex. 1, at "MetLife Brand Evolution")

 Preliminary Injunction Standards in a Lanham Act Action

The Lanham Act makes it unlawful for any person, in connection with goods, services, or containers for goods, to use in commerce "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval" of the goods, services, or commercial activity. 15 U.S.C. § 1125(a)(1). "A defendant will be held to have infringed on a protected mark if 'numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark.'" Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 217 (2d Cir. 2003) (quoting Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 390-91 (2d Cir. 1995)).

In order to obtain a preliminary injunction the plaintiffs must show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party seeking preliminary relief.

See, e.g., Brooks v. Giuliani, 84 F.3d 1454, 1462 (2d Cir. 1996); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979). Irreparable injury may be presumed based upon a plaintiff's showing of likelihood of success on a trademark infringement claim. Federal Express Corp. v. Federal Espresso, Inc., 201 F.3d 168, 174 (2d Cir. 2000).

Application of the Polaroid Factors to MLI's Claim of Consumer Confusion

In evaluating a trademark infringement claim, a court considers evidence of consumer confusion in light of eight factors set forth in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820 (1961). Those factors are: (1) strength of the plaintiff's mark, (2) similarity of plaintiff's and defendant's marks, (3) competitive proximity of the products, (4) likelihood that a plaintiff will "bridge the gap" and offer a product of the type that the defendants offer, (5) actual confusion, (6) good faith on the defendant's part, (7) quality of defendant's product, and (8) sophistication of the buyers. Id. The Polaroid factors must be considered in the context of how each factor supports or undermines the ultimate issue of whether a consumer will be confused by the disputed marks. Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 872 (2d Cir. 1986).

I address each factor in turn.

A. Strength of Plaintiff's Mark

"The strength of a mark refers to its distinctiveness, that is to say, the mark's ability to identify goods sold under it as coming from one particular source." Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 743 (2d Cir. 1998). "Ultimately, the strength of the mark turns on its origin-indicating quality, in the eyes of the purchasing public, so

that in a given case whether the mark has acquired secondary meaning is a matter which may be relevant and probative and hence useful in determining the likelihood of confusion." Lang v. Retirement Living Publishing Co., 949 F.2d 576, 581 (2d Cir. 1991) (internal quotation marks omitted). Distinctive lettering may render a mark strong, even if the overall mark is otherwise descriptive. Patsy's Brand, 317 F.3d at 217. In evaluating the lettering, a court may consider size, shape, color combinations, texture, and graphics. Id.

Inasmuch as it pertains to the blue, sans-serif logo heavily utilized in its promotional materials, MLI's MetLife trademark is strong. The MetLife mark is both inherently distinctive and distinct in the marketplace.

The MetLife logo often appears in a recognizable blue coloring. At the hearing, Hirschhorn described the color as "Pantone PMS 295 MetLife blue." (June 13 Tr. at 39) The words MetLife appear in the font Futura, modified slightly by MLI to establish "kind of a bold look."[1] (Tr. at 38-39) It is a sans-serif font that includes a sloping "M" and rounded lettering on the two e's. (Hirschhorn Dec. ¶ 8) In addition, the MetLife logo is presented as a single word, making it more distinctive than would be the case if the two terms were separated, with the "Met" abbreviation of "Metropolitan" used as a descriptor of the word "Life."

MLI aggressively markets its MetLife logo. (June 13 Tr. at 40-41) It spent more than $109 million in brand advertising and direct marketing in 2003. (Hirschhorn Dec. ¶ 4) In 2004, MLI spent $111 million to market the MetLife brand. (Hischhorn Dec. ¶ 4) Hirschhorn estimates that MLI has spent over a billion dollars on marketing in the

---

[1] Prior to a 1997 redesign, the MetLife logo was presented in the sans-serif font Helvetica, which is similar in appearance to the current logo's Futura font. (June 13 Tr. at 60) The logo atop the MetLife Building utilizes the Helvetica font and appears in thick white letters. (June 13 Tr. at 60-61)

past 15 years, and asserts that the MetLife brand is "well recognized and consumers attach tremendous goodwill to our trademarks." (June 13 Tr. at 41; Hischhorn Dec. ¶ 4) According to Hirschhorn, a study conducted by MLI showed 96% consumer awareness for MetLife, which she says is "one of the highest of any brand in the world." (Hirschhorn Reply Dec. ¶ 9) The MetLife Building, located at 200 Park Avenue in Manhattan, is adorned with the lettering "MetLife" near the top of the structure. I take judicial notice of the fact that the building's logo is visible throughout much of Manhattan, and evidence introduced at the hearing shows that the building's logo also is visible within close proximity to the MetBank office.

In light of the foregoing, I conclude that MLI has a strong mark in its MetLife logo.

### B. Similarities of the Marks

The MetBank logo and the MetLife logo are highly similar. Both utilize sans-serif fonts, with text printed in blue. "In assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." Gruner + Jahr U.S.A. Publishing v. Meredith Corp., 991 F.2d 1072, 1078 (2d Cir. 1993). Typefaces are relevant considerations when evaluating marks' similarities. Lang, 949 F.2d at 582. MNB contends that the darker shade of blue on its logo and small variations in the fonts warrant my concluding that the marks lack similarity.

True, the MetBank logo appears in a shade of blue deeper than the MetLife logo. (McAllister Dec. ¶ 9) Nevertheless, the difference in shade is not so notable that a consumer or passerby would readily differentiate between MetBank's blue and MetLife's

blue. While the shade of MNB's blue is slightly darker, it is not so dark as, for example, the color navy blue. I credit Ms. Hirschhorn's testimony in which she described how the MLI and MNB shades of blue are listed in close proximity to each other in the Pantone directory, which she asserted is a commonly used sourcebook of colors employed in print advertising. (June 13 Tr. at 53-56)

In addition, as MNB points out, the sans-serif fonts used by the plaintiffs' and defendant's logos are not identical. (McAllister Dec. ¶ 8) The MetLife logo's Futura font results in letters that are visibly thicker than the same letters in the MetBank logo. (McAllister Dec. ¶ 8) In addition, the "e" letters in MetLife are more rounded than the letters in the MetBank logo, and the "t" contained in the MetBank logo includes a rounded, hook-like base, whereas the "t" in MetLife is more angular, resulting in lettering "resembling a cross." (McAllister Dec. ¶ 8)

McAllister asserts that these differences, while not "terribly significant" in isolation, create distinct impressions when assessed in their totality. (McAllister Dec. ¶ 9) I disagree. Ms. Hirschhorn described the MetBank font as being from the "same family of fonts" as the MetLife logo's Futura font. (June 13 Tr. at 52) The distinctions between the lettering of the MetLife logo and that of the MetBank logo are such that their distinctions become clear only after careful, side-by-side comparison and consideration. Indeed, Ms. Hirschhorn points out that the version of the MetLife logo atop the MetLife building utilizes the Helvetica font in which the "t" has a curved base akin to the "t" in MNB's logo. (June 13 Tr. at 60-61) From the appearance and overall impression, I conclude that a consumer of banking services standing in front of the Park Avenue branch of MNB

would not readily distinguish between MNB's blue logo and MLI's blue logo, except to note that one contains "Bank" and the other "Life."

There are additional bases for concluding that the two marks are similar. Both marks are seven letters in length, with the first and fourth letters capitalized. Combined with the similarity of fonts and usage of blue lettering, the two marks leave an overall impression that is strikingly similar. While, as Mr. McAllister notes, it may be common for companies such as JetBlue and ConAgra to adopt such composite marks, the similarity here derives in large part from the common prefix "Met," coupled with a similar color and font style, followed by a four-letter word. Moreover, as noted by plaintiffs at the June 13 hearing, both logos utilize a sloping, slightly angular "M" in which the letter's base is wider than its top. (June 13 Tr. at 53) These "M's" contrast with the style of MNB's previous logo, where the "M" contained no sloping angle. (McAllister Aff. ¶ 5)

MNB's prior logo employed a figure of an eagle atop the lettering. It was a realistic image and conveyed a three-dimensional impression. In the new blue-font logo, a black-and-white, line-drawn eagle has been placed to the side of the text and has been redrawn to be less detailed, less realistic, and to have a more open interior. MNB argues that the eagle is a significant distinguishing characteristic between the two marks. The simple black-and-white eagle design has some design characteristics not unlike the black-and-white Snoopy cartoon character often included in MLI advertisements in proximity to MLI's blue logo. The Snoopy character has appeared in MetLife ads since 1985, often appearing adjacent to the MetLife logo. (June 13 Tr. at 48; Hirschhorn Reply Dec. Ex. 2; Hirschhorn Dec. Ex. 2) A reasonably observant consumer looking at the drawings of the two creatures would never mistake the MNB eagle for Snoopy. But I do reject MNB's

argument that the overall similarity of the two marks is substantially lessened by the placement of the black-and-white, line-drawn eagle to the right of the blue text.

I conclude that MNB's mark is similar to MLI's mark, thus supporting a finding of likely consumer confusion.

C.  Proximity of products and services

In considering the proximity of the products, a court examines the extent to which the products compete with one another, and how this competition may lead to consumer confusion.  See Brennan's, Inc. v. Brennan's Restaurant LLC, 360 F.3d 125, 134 (2d Cir. 2004); Lang, 949 F.2d at 582.  Competitive proximity considers two elements: market proximity and geographic proximity.  Brennan's, 360 F.3d at 134.

It is indisputable that MLI and MNB each engage in retail banking geared toward consumers.  MLI has registered a trademark for use of the mark MetLife Bank for the provision of banking services, credit card services, mortgage lending, and retail banking services.  (Hirschhorn Dec. ¶¶ 3, 5(c))  Similarly, MNB has a registered trademark in "METBANK" for use in banking services.  (Werbin Dec. Ex. F)  MNB's line of business has included retail banking and financial services since 1999, including checking accounts, savings accounts, mortgage lending, and ATM services.  (DeFazio Dec. ¶¶ 2, 9)  The market proximity of MNB and MLI was indisputably high at the time that MNB adopted its revised "MetBank" logo.

In addition, I note that there is close geographic proximity between MNB's anticipated street-level branch and the MetLife Building.  As shown by evidence introduced at the June 13 hearing, the prominent signage atop the MetLife Building is visible from the street outside of MNB's branch location.  Because MNB's branch office

is located in the shadow of a prominent Manhattan skyscraper containing plaintiffs' logo, I find that the geographic proximity of MLI and MNB is high.

### D. Likelihood of bridging the gap

This factor requires the court to consider the likelihood that the parties will engage in the same business at some point in the future. Because both parties now engage in retail banking, I do not consider this factor.

### E. Evidence of actual confusion

Actual confusion need not be shown to prevail under the Lanham Act; a plaintiff need only establish that there is a likelihood of confusion as to a mark's source. Lois Sportswear, 799 F.2d at 875. A survey as to the potential consumer confusion may be weighed when considering the likelihood of confusion. Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 259 (2d Cir. 1987) (Lumbard, J.). Evidence of actual confusion weighs most heavily once two marks have been in competition for a substantial period of time. Lois Sportswear, 799 F.2d at 875. Here, MNB's new logo has not been in wide use for an extended period of time.

MLI submits the declaration of Philip Johnson, the CEO of Chicago-based market research firm, Leo J. Shapiro and Associates, Inc. (Johnson Dec. ¶ 1) Johnson conducted a survey of 350 consumers in an effort to determine whether they were likely to confuse the parties' marks; the questions were administered to potential consumers of banking services in midtown Manhattan. (Johnson Dec. ¶ 5-6) A test group was shown the blue "MetBank" logo as photographed at the 99 Park Avenue location and a control group was shown a similar blue logo with the name "MetroBank." The images were identical in size, quality, and manner of depiction. The interviewers did not mention the

names Metropolitan Life or MetLife to either the test group or the control group.  The

results of the survey were that 38% of the test group believed that MetBank was owned,

operated, associated with, or sponsored by MLI.  In contrast, only 4% of the control

group believed  that "MetroBank" was owned, operated, associated with or sponsored by

MLI.  Johnson considered the net difference between the two groups of 34% to be

significant.  He concludes that "there is a significant degree of likelihood of confusion

found in the marketplace such that consumers of retail banking services in midtown

Manhattan mistakenly believe that MetBank is owned by MetLife, or is a related,

sponsored, or associated facility."  (Johnson Dec. ¶ 25)[2]

     MLI also submits an affidavit from Robert Fitzgerald, an insurance

industry professional who states that he was confused as to whether MetBank was owned

by or affiliated with MetLife.  (Fitzgerald Dec. ¶¶ 1-4)  Fitzgerald e-mailed an MLI

employee as follows: "Am I right that this is not an arm of MeLife [sic]?  If not they

certainly push the idea with the large B in MetBank."  (Fitzgerald Dec. Ex. B)

     In opposition, MNB submits the declaration of George Mantis, an expert

in consumer surveys, who has reviewed the Johnson survey.  In his declaration, Mantis

asserts that MLI's study was premised on deficient methods and flawed consumer

sampling.  For instance, he contends that in order to be probative, a study of consumer

confusion must be based on the perceptions of likely purchasers of the defendant's

products or services, not just the public at large.  (Mantis Dec. ¶ 9)  Mantis contends that

---

[2] At the hearing, Johnson testified that his firm conducted a second survey in response to criticism lodged
on behalf of MNB, which asserted that questions designed to exclude persons employed in the financial
services and insurance industries unduly influenced persons to think about insurance, which , in turn, might
lead them to think about MLI.  The second survey, without these screening questions and conducted
primarily on a Saturday, confirmed a net difference of 25 percent between the test and control groups as to
a belief of ownership, operation, affiliation or sponsorship by MLI.

it is essential to the validity of the study to restrict the sample pool to prospective purchasers of bank services, a group he would limit to those who do not have a satisfactory pre-existing relationship with a bank.  (Mantis Dec. ¶ 10)[3]  In assembling the pool of consumers, Mantis states, Johnson failed to assemble a representative population because the surveyed group tended to be younger than the U.S. Census data would lead one to predict of a representative sample.  (Mantis Dec. ¶¶ 14-17)  Lastly, Mantis contends that the Johnson Study was stripped of marketplace and commercial context, leading to "a word association test, not a test of confusion."  (Mantis Dec. ¶ 27)  Notably, MNB did not offer evidence of any consumer study of its own.

In evaluating the sampling methods employed by an expert, a court should consider factors such as whether 1) the population was properly chosen and defined, 2) the sample chosen was representative of that population, 3) the gathered data was accurately reported, and 4) the data was analyzed in a manner consistent with accepted statistical principles.  MANUAL FOR COMPLEX LITIGATION (FOURTH) § 11.493 (2004).  In addition, when considering the validity of a survey, the court should consider whether 1.) the survey questions were clear and not leading, 2.) the survey was conducted by qualified persons, and 3.) the survey was conducted in a manner that ensured objectivity.  Id.  Nevertheless, even a flawed survey as to consumer confusion can be "somewhat probative" as to the risk of actual confusion in the post-sale context.  Lois Sportswear, 799 F.2d at 875.

I have examined the instructions to the interviewers, the screening criteria for inclusion of test participants, the precise wording of the questions posed to the

---

[3] To state the obvious, consumers are not precluded from having a banking relationship with more than one institution. The decision to open an account or purchase a certificate of deposit from a bank need not be accompanied by dissatisfaction with the customer's pre-existing bank.

subjects, and the methodology in reporting and analyzing the results.  I have viewed the

foregoing in light of the criticisms of MNB's expert and the standards set forth in the

Manual for Complex Litigation.  The universe of potential survey participants was

defined as those over the age of 18 who say they will "definitely," "probably," or

"maybe" bank in midtown Manhattan in the next twelve months.  Potential participants

were selected at random according to a counting formula. The interviewers were not

informed of the identity of the entity commissioning the study. While Mantis claims that

the survey underrepresented persons over age 45 as measured by U.S. Census data, he

offers no age data for persons likely to conduct banking in midtown Manhattan, a

population likely to be skewed toward persons presently in the workforce.  The record

before me shows the data was accurately reported and analyzed in a manner consistent

with accepted principles.  I conclude that the methodology has sufficient validity to give

the survey probative value. The Johnson survey is evidence of consumer confusion.

Because MNB has not yet entered the marketplace, the issue of actual

confusion has limited bearing on my consideration of this motion.  Nevertheless, the

Johnson study supports the conclusion that there is a likelihood of consumer confusion.

F.   Good Faith

Intentional bad-faith copying of a trademark establishes a presumption

that the copier succeeded in causing confusion.  Paddington Corp. v. Attiki Imports &

Distributors, Inc., 996 F.2d 577, 586-87 (2d Cir. 2003) (collecting cases).  "Where such

prior knowledge is accompanied by similarities so strong that it seems plain that

deliberate copying has occurred, [the Second Circuit has] upheld findings of bad faith."

Id. at 587.

The logo utilized by MNB at its retail banking facility is strikingly similar to MLI's "MetLife" logo, such that, at the preliminary injunction stage, a conclusion of bad faith is appropriate. See Paddington Corp., 996 F.2d at 586-87; American Chicle Co. v. Topps Chewing Gum, Inc., 208 F.2d 560, 562-63 (2d Cir. 1953) (evidence of highly similar mark supports inference of bad-faith conduct) (L. Hand, J.). I credit the testimony of Mr. DeFazio insofar as he stated that the MetLife logo did not "come up in any way" during the redesign process. (Tr. at 106) Nevertheless, the similarity between the parties' marks is such that it strains credulity to believe that neither MNB nor the firm it hired to redesign its logo were not consciously influenced by the MetLife logo. This is particularly true in light of the PTO's initial concerns about the similarity between the first MetBank logo and the MetLife mark. See Paddington Corp., 996 F.2d at 587 (actual or constructive knowledge of the prior user's mark may indicate bad faith). Having been placed on notice by the PTO that the initial MetBank mark risked consumer confusion with MLI's marks, MNB nevertheless proceeded to adopt a mark highly similar to the MetLife logo.

I find that there is circumstantial evidence of bad faith on the part of MNB that lends further support to the grant of a preliminary injunction.

G.  Quality of Services

"Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product." Gruner + Jahr, 991 F.2d at 1079. The parties do not address in significant detail the quality of the services provided by MNB. MNB contends that its products and services are in no way inferior to the plaintiffs', and the plaintiffs

state that they do not know the quality of MNB's retail banking products and services. Plaintiffs assert that to the extent that MNB's services are comparable to their own, the likelihood of confusion is heightened. See Morningside Group Ltd. v. Morningside Capital Group, LLC, 182 F.3d 133, 142 (2d Cir. 1999) (noting that comparable quality of service may heighten the likelihood of consumer confusion).

Because the parties have failed to submit proof as to the quality of their respective products and services, the evidence does not favor either side on this issue.

H.  Sophistication of Consumers

The sophistication of the intended consumer is a factor to be considered in evaluating the likelihood of consumer confusion. A higher degree of consumer sophistication decreases the risk of consumer confusion. Courts have held that when the process of purchasing a financial instrument or service entails several steps and substantial funds, the buyer sophistication is presumably higher. See Beneficial Corp. v. Beneficial Capital Corp., 529 F. Supp. 445, 450 (S.D.N.Y. 1982). Nevertheless, the financial services industry is not immune from the Lanham Act because of the sophistication of its consumers. See Lexington Mgt. Corp. v. Lexington Capital Partners, 10 F. Supp. 2d 271 (S.D.N.Y. 1998) (granting a preliminary injuction). The services to be offered by MNB at 99 Park Avenue include a range of retail financial services. These will likely call into play more sophisticated scrutiny than, for example, the purchase of a consumer good selling for under twenty dollars. But the level of sophistication required for opening a bank account or purchasing a certificate of deposit is moderate and does not approach that of a business-to-business transaction.

Based on the record before me, I conclude that the evidence of the moderate level of sophistication of consumers of basic retail banking services does not tip the scales one way or the other on this final <u>Polaroid</u> factor.

<u>MNB Has Not Established Priority as to the Disputed Logo</u>

"The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially." <u>La Societe Anonymes des Parfums Le Galion v. Jean Patou, Inc.</u>, 495 F.2d 1265, 1271 (2d Cir. 1974). If "two or more companies adopt the same mark, basic rules of trademark priority determine use and ownership of the mark." <u>Buti v. Impressa Perosa, S.R.L.</u>, 935 F. Supp. 458, 468 (S.D.N.Y. 1996).

MNB contends that it possesses "prior and superior rights" as to the use of the MetBank trademark. MNB began utilizing the mark "MetBank" for banking services at a point in time when MLI was precluded by federal law from offering banking services. <u>See</u> Banking Act of 1933, Pub. L. No. 73-66, 48 Stat. 162 (the "Glass-Steagall Act"). While it is true that MNB utilized an earlier version MetBank mark – black lettering with serifs and the eagle atop the "e" and "t" – before MLI began to offer retail banking services, the plaintiffs made clear at the June 13 hearing that they are no longer seeking to preliminarily enjoin that mark.

Because the plaintiffs significantly narrowed the scope of this motion at oral argument, and because the defendant's arguments are not tailored to the use of the current blue, sans-serif MetBank logo, the concept of priority does not present an obstacle to the plaintiffs' motion. MNB's first trademark registration was specific to its

previous logo, which is not implicated in this motion. (Werblin Dec. Ex. E) MNB's

second trademark registration granted rights to the mark "METBANK" for use in

connection with banking services, but contained no specific design elements such as

color or font and, indeed, does not address the use of lower case letters for all but the first

and fourth letters. (Werblin Dec. Ex. F) This second registration does not provide

priority for the blue, sans-serif MNB logo that MLI contends infringes the MetLife mark.

MetLife's current logo has been in use since 1997, and varies only slightly from the logo

that dates back to 1968. "The exclusive right to a distinctive mark belongs to the one

who first uses it in connection with a particular line of business." <u>Talk To Me Products,</u>

<u>Inc. v. Larami Corp.</u>, 804 F. Supp. 555, 559 (S.D.N.Y. 1992) (citing <u>McLean v. Fleming</u>,

96 U.S. 245 (1877)). MLI's current MetLife logo predates MNB's trademark

registrations. I conclude that MNB does not have priority to the blue, sans-serif logo at

issue on this motion.

<u>New York Trademark Dilution</u>

   In addition to the Lanham Act claims, plaintiffs also seek a preliminary

injunction on the basis of New York's law of trademark dilution.

   MNB argues that plaintiffs' dilution claim fails because MNB has

registered two trademarks for the MetBank mark as it pertains to banking services.

Pursuant to the Lanham Act, federal registration of a trademark establishes a complete

affirmative defense to a state dilution claim. 15 U.S.C. § 1125(c)(3); 4 McCarthy on

Trademarks § 24.82. In MLI's reply brief, plaintiffs assert that they are seeking to enjoin

use of MNB's "current logo, which is not federally registered," and contend that the

affirmative defense is therefore invalid. (Reply Br. at 20) Because this motion for a

preliminary injunction hinges on MNB's use of the blue, sans-serif unregistered logo, I conclude that the action is not preempted by the Lanham Act.

Under New York law, "[d]ilution has been defined as either a blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey. A prerequisite to a finding of dilution is that the marks are substantially similar." Savin Corp. v. Savin Group, 391 F.3d 439, 455 (2d Cir. 2004). A likelihood of confusion is not a necessary prerequisite to establish trademark dilution. Allied Maintenance Corp. v. Allied Mechanical Trades, Inc., 42 N.Y.2d 538, 541-42 (1977). The Second Circuit also has observed that a plaintiff must prove that its trademark has "a truly distinctive quality or has acquired secondary meaning," and that predatory intent may also be a significant consideration in finding a violation. Deere & Co. v. MTD Products, Inc., 41 F.3d 39, 42 (2d Cir. 1994).

As with the Lanham Act claim, I conclude that plaintiffs have established a likelihood of success as to the blue, sans-serif logo, and that their motion for a preliminary injunction should be granted as to the use of that logo at MNB's 99 Park Avenue branch office. As previously discussed, the coloring, font and overall appearance are sufficiently distinct and the advertising of the mark has been widespread such that the MetLife logo has attained secondary meaning. MNB's opposition to the New York dilution claim was based on a defense to MLI's broader assertion that MNB is barred from using the "Met" prefix entirely, a contention that I need not reach on this motion. Plainitiffs have shown a likelihood of success on their New York anti-dilution claim.

MLI Did Not Unduly Delay Pursuing Injunctive Relief as to the New MetBank Logo

MNB contends that injunctive relief should be denied because MLI engaged in undue delay prior to commencing this litigation. I conclude that the relatively modest delay by MLI does not foreclose its claim for injunctive relief insofar as it seeks to enjoin use of MNB's new blue "MetBank" logo at the planned street-level retail branch.

A party's delay in bringing an infringement action is relevant to considering injunctive relief against an alleged trademark infringer. See Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 222 (2d Cir. 1999) (overruled on other grounds, Moseley v. V Secret Catalogue, Inc., 537 U.S. 418 (2003)). A "presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." Tough Traveler, Ltd. v. Outbound Products, 60 F.3d 964, 968 (2d Cir. 1995).[4] Although the law of this Circuit is not explicit as to which party bears the ultimate burden of proof on the issue of delay, both parties agree that the opposing party must first come forward with evidence of delay, at which point the plaintiff must set forth a legally sufficient explanation for the delay. See S.D. Markowitz Jewelry Co. v. Chapal/Zenray, Inc., 988 F. Supp. 404, 406-08 (S.D.N.Y. 1997) (first observing that the plaintiff acted with undue delay in seeking relief, then evaluating whether plaintiff set forth a credible explanation for the delay). It is logical that the movant should bear the ultimate burden of proof on the absence of delay because it is on the movant's shoulders to prove that it will suffer irreparable harm if no injunction is granted. In this case, I hold

---

[4] Delay as analyzed in these cases is a concept distinct from laches, a doctrine that requires the additional element of prejudice. See Brennan v. Nassau County, 352 F.3d 60, 64 (2d Cir. 2003).

MLI to that burden and conclude that it is has not unreasonably delayed in seeking judicial relief.

MNB did not announce its plans to open a street-level retail operation at 99 Park Avenue until December 31, 2004 (DeFazio Dec. ¶ 23), the eve of a holiday. Slightly more than 3 1/2 months passed between MNB's announcement and MLI's initiation of this litigation. During that time, MLI investigated the likelihood of consumer confusion, including the commission of the Johnson study. There is no evidence that this passage of time amounted to dilatory conduct on the plaintiffs' part, or that it was due to anything more than an effort to investigate facts relevant to this motion. See King v. Innovation Books, 976 F.2d 824, 831 (2d Cir. 1992) (eight-month delay between discovery of infringing activity and lawsuit's initiation was explained by a need to investigate underlying facts and negotiate with the alleged infringer).

Relief

Having found a likelihood of consumer confusion and that the plaintiffs will suffer irreparable harm in the absence of an injunction, I GRANT plaintiffs' motion for a preliminary injunction. Pursuant to Rule 65, Fed. R. Civ. P., defendant Metropolitan National Bank and those in active participation or concert with it are hereby enjoined from exhibiting, displaying or employing in any manner the term "MetBank" in a sans-serif font in any shade of the color blue in or at a street-level banking facility at 99 Park Avenue, New York, NY. Plaintiffs will be required to post a bond in the amount of $200,000 by June 27, 2005.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
June 22, 2005